# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**RANDALL GRAHAM**                                    **CIVIL ACTION**
**(DOC# 219184)**

**VERSUS**

**BURL CAIN, ET AL**                                    **NO. 07-524-C-M2**

## <u>NOTICE</u>

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 10 days from the date of service of this Notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report.  The failure of a party to file written objections to the proposed findings, conclusions, and recommendation contained in a Magistrate Judge's Report and Recommendation within 10 days after being served with a copy of the Report shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge that have been accepted by the District Court.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in chambers in Baton Rouge, Louisiana, October 16, 2008.

_____

**MAGISTRATE JUDGE CHRISTINE NOLAND**

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

**RANDALL GRAHAM**                                         **CIVIL ACTION**
**(DOC# 219184)**

**VERSUS**

**BURL CAIN, ET AL**                                          **NO. 07-524-C-M2**

**MAGISTRATE JUDGE'S REPORT**

    This matter is before the Court on the Petition for Writ of Habeas Corpus (R. Doc.
1) filed by Randall Graham ("Graham").  The State of Louisiana ("the State") has filed an
opposition (R. Doc. 15) to Graham's petition.

**PROCEDURAL BACKGROUND**

    Graham was charged by grand jury indictment with one count of second degree
murder.  Prior to trial, he filed a motion to suppress his statements to police officers, which
motion was denied.  He filed a writ application with the Louisiana First Circuit Court of
Appeals, seeking review of the denial of his motion to suppress.  That writ was denied on
March 30, 2000.  Graham then pled not guilty to the charge against him, and after a trial
by jury, was found guilty as charged.  He filed a motion for new trial, which was denied by
the trial court on May 8, 2001.  He was then sentenced to a term of life imprisonment at
hard labor without the benefit of parole, probation, or suspension of sentence.

    Graham appealed his conviction and sentence to the Louisiana First Circuit Court
of Appeals.  In his appeal, he raised the following issues:  (1) the trial court erred in denying
his motion to suppress certain statements based upon his right against self-incrimination
and right to counsel; (2) the trial court erred in allowing Dr. Suarez, a forensic pathologist,

1

to testify regarding the amount of force needed for the penetrating wound to the victim; (3) the trial court erred in denying his motion for mistrial, which was based upon a comment made during the State's closing argument that referred directly or indirectly to the defendant's failure to testify in his own defense; and (4) the trial court erred in denying his motion for new trial since the evidence adduced at trial was not sufficient to support the verdict.  The First Circuit affirmed Graham's conviction and sentence on June 21, 2002. Graham then applied for a writ of certiorari to the Louisiana Supreme Court, wherein he asserted the following claim of error:  The trial court erred in denying his motion to suppress based on defendant's request for counsel prior to a polygraph test and the continued interrogation by police officials after such request.  The Louisiana Supreme Court denied Graham's writ application relative to his direct appeal on January 31, 2003.

Graham then filed an application for post-conviction relief with the state trial court, which was denied on February 21, 2006.  In that application, he asserted the following claims for relief:  (1) Whether trial counsel's assistance was deficient in not objecting to Dr. Suarez's expert testimony as to the manner of death; (2) Whether trial counsel's assistance was deficient in not objecting to Dr. Suarez testifying as an expert witness; (3) Whether appellate counsel was deficient in not assigning error to the trial court for admitting photos of the entrance wounds of the victim; (4) Whether appellate counsel was deficient in not assigning error to the omission of a special jury instruction for self-defense; (5) Whether appellate counsel was deficient in not assigning error to the introduction of two arrows at trial; (6) Whether trial counsel was deficient in stipulating to the Louisiana State Crime Lab report by Carolyn Booker, a forensic scientist; (7) Whether trial counsel was deficient in not objecting to the omission of a jury charge on a hung jury; (8) Whether the trial court erred

2

in denying defendant's motion to suppress; (9) Whether defendant was denied effective assistance of counsel because of his counsel's medical condition.  Graham sought writs from both the First Circuit Court of Appeals and the Louisiana Supreme Court relative to the denial of his post-conviction relief application, which requests were denied on June 13, 2006 and April 5, 2007 respectively.

Finally, on July 23, 2007, he placed his present habeas petition into the U.S. mail for filing with this Court.  In his habeas petition, Graham raises the following issues:

> (1)   Whether the trial court erred in denying a motion to suppress statements based upon petitioner's right against self-incrimination and right to counsel?

> (2)   Whether the trial court erred in allowing Dr. Suarez, a forensic pathologist, to testify regarding the amount of force needed for the penetrating wound to the victim?

> (3)   Whether the trial court erred in denying petitioner's motion for a mistrial, which was based upon an alleged improper reference during the State's closing argument to the petitioner's failure to testify at trial?

> (4)   Whether the trial court erred in denying petitioner's motion for a new trial, which was based upon an argument that the evidence admitted at trial was insufficient to support petitioner's conviction?

In its opposition to Graham's habeas petition, the State contends that his claims should be dismissed with prejudice because: (1) his third and fourth claims were not fully exhausted through the state court system; (2) his second, third and fourth claims do not present a constitutional or federal law claim that can be considered by this Court; and (3) substantively, all of petitioner's claims lack merit.

## **FACTUAL BACKGROUND**

During the early morning hours of December 27, 1998, Graham witnessed an argument between the victim, Juliette Collins ("Collins"), and her husband at a bar in Livonia, Pointe Coupee Parish, Louisiana.  He spoke with Collins at the bar and met her outside her mother's home.  The next day, Collins' mother reported her missing, and law enforcement officials initiated a missing persons investigation.

During the course of the missing persons investigation, Graham was interviewed by law enforcement authorities.  He ultimately provided several inculpatory statements to the officers.  He told the officers that, after he met Collins outside her mother's home, he followed her to a barn where she left her car and entered his pickup truck.  He told officers that they drove around until they were able to locate some crack cocaine.  He explained that they entered Iberville Parish and parked the truck in an isolated field off of Louisiana Highway 76, south of Maringouin.  They then smoked the crack cocaine and had sex.  Graham further told police that Collins became angry at him because he would not agree to give her money to help her pay debts.  Collins exited the truck and went around to Graham's side of the truck, where he also exited.  According to Graham, Collins pushed his head against the truck window, and in self-defense, he reached inside his truck and grabbed a hunting arrow to defend himself against Collins.  Graham told police that Collins walked into the arrow and was killed.

Graham admitted to removing the arrow from Collins by forcing it all the way through her body.  He also admitted to washing the arrow and then driving twenty-six (26) miles to the Melville ferry landing, where he dumped her body into the Atchafalaya River.  Bloodstains that matched Collins' DNA were found on the defendant's bow as well as on

4

his arrow case.  Graham did not exhibit any cuts or bruises on the day after the murder, and there was no damage to the window of the truck where Collins purportedly pushed Graham's head.  Collins' body was found in the Atchafalaya River forty-one (41) days after she was reported missing.  She had a large puncture wound to the left side of her rib cage and two cracked ribs.

## LAW & ANALYSIS

### I.    Exhaustion - Claim Nos. 3 and 4:

To satisfy the exhaustion requirement, the petitioner must "fairly present" the substance of his federal habeas claim to the highest state court.  *Ries v. Quarterman*, 522 F.3d 517 (5th Cir. 2008).  "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made."  *Bagwell v. Dretke*, 372 F.3d 748, 755 (5th Cir. 2004).  Rather, the petitioner must afford the state court a "fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim."  *Id.*  In Louisiana, the highest state court is the Louisiana Supreme Court.  Graham did not present his third and fourth habeas claims to the Louisiana Supreme Court for review either on direct appeal or through a writ application relating to the denial of his post-conviction relief application.  Accordingly, he failed to exhaust his state court remedies relative to those two claims.  Ordinarily, when a habeas petitioner fails to exhaust his state court claims, such claims are dismissed without prejudice so that the petitioner can return to state court and attempt to exhaust them.  However, in the present case, Graham would be procedurally barred from presenting his third and fourth claims to the state courts based upon La. C.Cr.P. art. 930.8, which provides that no application for post-conviction relief can be considered if filed more than two (2) years after the judgment

of conviction and sentence has become final.  Graham's conviction and sentence became final on May 1, 2003, ninety (90) days after the Louisiana Supreme Court denied his writ application relative to the affirmation of his conviction and sentence because petitioner did not seek review on direct appeal to the U.S. Supreme Court.  Accordingly, he had until May 1, 2005, within which to file a post-conviction relief application or an out-of-time appeal raising the issues in his third and fourth habeas claims.  However, he failed to do so, and any such claims filed at this point would be dismissed by the state court as procedurally barred due to untimeliness.  As such, his third and fourth habeas claims should be dismissed with prejudice.

## II.      Failure to raise a federal/constitutional claim - Claim Nos. 2 and 3:

In addition, Graham's second and third habeas claims should be dismissed with prejudice because they do not raise a federal/constitutional claim properly before this Court on habeas review.  The United States Supreme Court has held that is it is not the province of a federal habeas court to reexamine state court determinations on state law questions. *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).  Instead, in conducting habeas review, a federal court is limited to deciding whether a conviction violated the U.S. Constitution, laws or treaties of the United States.  *Id.*[1]  Although Graham alleges in a conclusory fashion that his second and third habeas claims involve decisions by the Louisiana state courts that were "contrary to clearly established federal law," he

---

[1] Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law unless a federal issue is also presented. *Leblanc v. Quarterman*, 2008 WL 2330746 (N.D. Tex. 2008); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996).  In the course of reviewing state proceedings, a federal court does not sit as a super state appellate court.  *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986).

does not cite any particular federal or constitutional law that such decisions violate, and the Court's review of those claims indicates that they are entirely related to alleged violations of state law.  For example, in Claim No. 2, Graham alleges that the trial court erred in allowing Dr. Suarez to testify regarding the amount of force needed for the penetrating wound sustained by the victim in violation of La. C.E. Art. 702.  In Claim No. 3, Graham contends that the trial court erred in denying his motion for mistrial based upon La.C.Cr.P. Art. 770, which requires that a mistrial be granted when a remark or comment made by the prosecution within the hearing of the jury either directly or indirectly refers to the failure of the defendant to testify in his own defense.  Since such claims do not involve consideration of any questions of federal or constitutional law, review of such claims is not proper on habeas review, and Claim Nos. 2 and 3 should be dismissed with prejudice.[2]

## III.    Merits of Claim No. 1:

As mentioned above in the "Procedural Background" section of this report, the first claim in Graham's habeas petition was previously submitted to and ruled upon by the state

---

[2] Although the State contends that Graham's fourth claim should also be dismissed because it does not involve a question of federal or Constitutional law, the Court disagrees.  Graham has asserted, in his fourth claim, that the trial court erred in denying his motion for new trial, which was based upon an argument that the evidence admitted at trial was insufficient to support petitioner's conviction.  He specifically argues in his habeas petition that his conviction should be overturned based upon the "constitutional standard for testing the sufficiency of the evidence, enunciated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560, 573 (1979)." Because Graham is challenging the sufficiency of the evidence supporting his conviction under the appropriate federal standard, the Court could have reviewed the merits of his fourth claim, but only if Graham had properly exhausted his state court remedies relative to that claim.  Because he failed to exhaust and would be procedurally barred from now exhausting his remedies in state court, as discussed above, his fourth habeas claim should be dismissed with prejudice without consideration of the merits of that claim.

courts on direct appeal and during his post-conviction relief proceedings. He therefore exhausted his state court remedies relative to that claim. In order for this Court to grant an application for a writ of habeas corpus as to any claim which has been previously adjudicated on the merits in state court, the Court must find that adjudication of such claim: (1) resulted in a decision that is contrary to, or involves an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1) and (d)(2).[3]

In his first claim, Graham contends that the trial court erred in denying his motion to suppress certain statements that he made during the course of his interrogation by the police based upon his constitutionally-guaranteed rights against self-incrimination and to counsel. The State maintains that the inculpatory statements of Graham were made during the investigatory stage of the case, at which time there was no 6th Amendment right to counsel nor was there any requirement that *Miranda* warnings be issued since Graham voluntarily came to the police station to be questioned.

**(A)    Motion to Suppress Hearing:**

In order to evaluate the merits of this claim, the Court must examine the testimony

---

[3] In addition, determinations of factual issues made by state courts shall be presumed correct, unless particular statutory exceptions to 28 U.S.C. § 2254(d) are implicated, and the applicant has the burden of rebutting that "presumption of correctness" by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Williams v. Collins*, 16 F.3d 626 (5th Cir. 1994). Thus, the presumption of correctness is properly invoked if the petitioner fails to contend that any exceptions to § 2254(d) are applicable to his case and if the Court finds that there were no defects in the state court's procedures. *Id.* at 631.

presented at the motion to suppress hearing concerning the statements Graham made to police.  At that hearing, the State called as witnesses various law enforcement officials who interacted with Graham in the days following Collins' disappearance.  The State first called the Chief of Police for Pointe Coupee Parish, Frederick Gueho, Jr. ("Chief Gueho") to the witness stand.  Chief Gueho testified that he was involved with the investigation of Collins' disappearance on December 28, 1998 and that he questioned Graham on that date.  *See*, State court record, R. Doc. 16, p. 80.  He testified that Collins' father contacted him and advised that Collins had last been seen with Graham in Livonia.  *Id.*  Chief Gueho therefore tried to contact Graham and left him a message on his answering machine at his residence. *Id.*  Graham returned Chief Gueho's call, at which point Chief Gueho told him that he needed to talk to him about Collins' disappearance.  *Id.*  Graham voluntarily agreed to come to the substation to talk to police but indicated that he did not have transportation and asked if Chief Gueho would transport him to the police station.  *Id.*  Chief Gueho agreed and transported Graham from his home to the substation.  *Id.*, p. 81.

When Chief Gueho and Graham arrived at the Livonia substation, Chief Gueho completed a *Miranda* rights form, which he, Graham, and Detective Willie Olinde ("Detective Olinde") signed.  *Id.*, pp. 81-82.  Chief Gueho testified that Graham was read the *Miranda* warnings and was asked if he understood his rights and that, prior to signing the form, Graham indicated he understood his rights.  *Id.*, p. 82.  Chief Gueho further indicated that there were no threats, promises or coercion made toward Graham to get him to sign the form.  *Id.;* p. 83.  Chief Gueho checked the box on the form reflecting that Graham stated he understood his *Miranda* rights as explained to him.  *Id.*, pp. 82-83.  The form further reflects that Graham indicated, with knowledge of those rights, he wished to

talk to police.  *Id.*, p. 83.  According to Chief Gueho, Graham did not seek to see an attorney at the time he signed the rights form or during the conversation following execution of the rights form and that Graham fully cooperated during that conversation. *Id.*

After signing the rights form, Graham discussed his knowledge of Collins with Chief Gueho, Detective Olinde, and Detective Michael Sparks ("Detective Sparks").  *Id.*, p. 84. Graham explained that, on the night in question, he had been at a bar in Livonia and that Collins asked him to follow her to her mother's house and wait at the corner of the street. *Id.*, p. 84-85.  Graham did so and waited until Collins left her mother's home.  *Id.*, p. 85. Graham then followed Collins to a barn, where she left her car and got into Graham's truck. *Id.*  At that point, Graham and Collins went to look for drugs.  *Id.*  Graham told police that, after they located drugs, he and Collins went off on a road and did the drugs and had sex. *Id.*  They then went back to her car, where Graham dropped her off and left.  *Id.*  He indicated that was the last time he saw Collins.  *Id.*

Subsequent to that initial statement to police, Chief Gueho spoke with Graham on another occasion.  *Id.*, p. 85-86.  Detective Olinde informed Chief Gueho that he had set up a polygraph test with the FBI in Baton Rouge for December 30, 1998, and asked Chief Gueho to locate Graham and ask him if he would be willing to take the polygraph test to clear him from the case.  *Id.*, p. 86.  Chief Gueho located Graham at the store where he worked in Livonia, Soprano's.  *Id.*  Chief Gueho went to Soprano's and discussed the polygraph test with Graham, and Graham indicated that he was willing to take the test.  *Id.* Initially, Chief Gueho suggested that he pick Graham up and that they ride to Baton Rouge together, and Graham agreed.  *Id.*, p. 86-87.  However, about ten minutes before Chief Gueho left the substation to go get him, Graham called and advised that he was not going

10

to go to Baton Rouge to take the polygraph test because his attorney had advised him not to do so.  *Id.*, p. 87.  According to Chief Gueho, however, Graham said he was not refusing to take the test but that he was just heeding the advice of his attorney.  *Id.*  Chief Gueho then contacted Detective Olinde at the FBI office and advised that Graham was not going to take the polygraph test.  *Id.*, p. 87-88.

At the suppression hearing, the State next called Special Agent Tom McNulty ("Agent McNulty") of the FBI in Baton Rouge, Louisiana, as a witness.  *Id.*, p. 92.  Agent McNulty testified that he first became involved in the investigation of Collins' disappearance when the victim's mother contacted him several times requesting assistance in locating her missing daughter.  *Id.*  Through his involvement in the missing persons case, he arranged for the polygraph tests of Graham and of Collins' husband, Terry Collins, on December 30, 1998.  *Id.*, p. 92-93.  Agent McNulty testified that, on the morning of December 30, 1998, he contacted the Pointe Coupee Sheriff's Office and spoke with Captain Ricky Jarreau ("Captain Jarreau") of the Pointe Coupee Sheriff's Office Chief of Detectives, and Major Buddy Leonard of the Pointe Coupee Sheriff's Office ("Major Leonard"), who explained that Graham was at the Livonia substation and that he was not sure whether or not he wanted to subject himself to a polygraph examination.  *Id.*, p. 93, 108-109.  At that point, Agent McNulty drove from Baton Rouge to the Livonia substation to discuss the polygraph exam with Graham.  *Id.*, p. 94.  Upon arriving at the substation, Agent McNulty advised Graham of his *Miranda* rights, and Graham informed Agent McNulty that he was willing to talk with him about the disappearance of Collins, which they discussed briefly.  *Id.*  Agent McNulty then discussed the polygraph test with Graham.  *Id.*  According to Agent McNulty's testimony, he explained to Graham what a polygraph test was and the reason why he

11

wanted him to take the test (*i.e.*, because the FBI's normal investigative procedure is to polygraph all persons that last contacted the victim prior to his/her disappearance before any further manpower, money, or time can be justified to go any further in the investigation). *Id.*, p. 94, 96, 108. Shortly thereafter, Graham decided he would take the test. *Id.*, p. 94. Agent McNulty testified that, at that point, Graham was not in FBI custody or the custody of any other law enforcement agency, and he could have left at any time. *Id.* Graham then rode to Baton Rouge with Agent McNulty to take the polygraph test. *Id.*

Agent McNulty testified that advising Graham of his *Miranda* rights while at the Livonia substation was not necessarily required procedure because Graham was not in custody and was there by his own free will; however, he did so to make sure that Graham did not want to have a lawyer present (or to at least consult with an attorney) prior to having any discussions with him or taking the polygraph test. *Id.*, p. 95. Agent McNulty indicated that he advised Graham of each of his *Miranda* rights and did not threaten, coerce, or promise him anything at the time he was advising him of those rights. *Id.* He further testified that Graham appeared to understand those rights and that he did not ask to speak with a lawyer (or mention anything about an attorney), at any point while he was being advised of his rights; during his discussions with Agent McNulty concerning Collins' disappearance and the polygraph testing; or on the way to the FBI office in Baton Rouge for the polygraph testing. *Id.*, p. 95-96, 110. According to Agent McNulty, Graham cooperated fully and voluntarily during those discussions and freely traveled with him from Livonia to Baton Rouge for the polygraph test. *Id.*, p. 96-97.

The polygraph test was administered by FBI Special Agent Edwards ("Agent Edwards"). During the test, Agent Edwards left the office where the test was being

12

administered and advised Agent McNulty that Graham had informed him that he killed Collins and that he was ready to provide a statement to Agent McNulty.  *Id.*, p. 97.  At that point, Agent McNulty spoke with Captain Jarreau and Major Leonard, and it was decided that Captain Jarreau would take a taped confession from Graham.  *Id.*, p. 98.  Agent McNulty was present during the taping of that statement.  *Id.*, p. 98.

According to Agent McNulty's testimony, Captain Jarreau read Graham his rights from a rights form at the time of the taped statement, and Graham initialed and signed that form.  *Id.*  Graham also indicated that he understood his rights and that he was going to give the statement freely and voluntarily.  *Id.*  Although Graham specifically stated that he understood his right to a lawyer, he did not ask for a lawyer at any point during his taped statement, and he specifically signed the line on the rights form waiving his right to a lawyer.  *Id.*, p. 99-100, 110-111.  Agent McNulty testified that no threats, coercion, or promises were made to Graham to get him to sign the rights form or to give his taped statement.  *Id.*, p. 100-101.  Following his taped statement, Agent McNulty kept Graham in his custody until he could be transported to Pointe Coupee Parish, where he was turned over to Detective Olinde and formally charged with the murder of Collins.  *Id.*, p. 102.

The State also called Captain Jarreau to the witness stand during the suppression hearing.  *Id.*, p. 111-112.  He testified that, on December 30, 1998, he received a phone call from Detective Olinde indicating that Graham had backed out of the polygraph test. *Id.*, p. 112.  He, along with several other officers, went to Soprano's and spoke with Graham, first verbally advising him of his *Miranda* rights and then asking him to come to the Livonia substation so they could discuss the matter further, and Graham freely agreed to do so.  *Id.*, 112-113.  Captain Jarreau testified that, at no point during the discussions

13

at Soprano's, did Graham discuss wanting to seek the advice of an attorney.  *Id.*, at 113.
When Graham arrived at the Livonia substation, Captain Jarreau asked Graham if he would
mind going over the details of his contacts with Collins on the night in question, which they
discussed for a few minutes.  *Id.*, p. 114.  Captain Jarreau then asked Graham why he did
not go take the polygraph test that day, and Graham told him that he had some concerns
about taking the test and that he was not sure if he wanted to take it or not.  *Id.*  According
to Captain Jarreau, Graham told him that some of his friends had told him not to take the
polygraph test.  *Id.*  At that point, Graham stated that he thought he should talk to an
attorney before taking a polygraph test.  *Id.*  Captain Jarreau asked him to whom he wanted
to talk, and Graham indicated that he would like to speak to Mr. Jerry D'Aquila.  *Id.*  Phone
calls were made to Mr. D'Aquila's office by Major Leonard, but he could not be reached.
*Id.*, p. 119, 120, 122-123.  Captain Jarreau asked Graham, if they were not able to reach
Mr. D'Aquila, whether he would still proceed with the test, and at that point, Graham
indicated that he was not sure.  *Id.*, p. 114.  Captain Jarreau asked Graham who had
represented him in a prior case, and Graham advised that his attorney was Kevin Kimball.
*Id.*  Captain Jarreau then asked Graham if he would like for him to try to contact Kevin
Kimball so that he could talk to him about whether or not he should take the polygraph test,
and after thinking about it, Graham indicated that he did not wish to do so and that he
would go ahead and take the test and "get it over with."  *Id.*, p. 114-115, 120, 125.[4] [5]

---

[4] Captain Jarreau specifically testified that, at the time this discussion occurred
regarding contacting an attorney, Graham had not been charged with any crime, and
the case was still in the investigative stage as far as trying to find out what had
happened to Collins.  *Id.*, p. 119.  At that point, the only information Captain Jarreau had
regarding Graham's involvement was what he had previously said in a statement to
Chief Gueho on December 28, 1998 – that he and Collins had parted ways at the barn.

Subsequently, Detective Olinde and Captain Jarreau advised Graham about who Agent McNulty was, *i.e.*, that he was the FBI agent working on the case. *Id.*, p. 115. At that point, Captain Jarreau exited the room and allowed Agent McNulty to speak with Graham. *Id.* Five to ten minutes later, Graham and Agent McNulty exited the room, and Agent McNulty advised that Graham had agreed to take the polygraph test and that they would be traveling to Baton Rouge. *Id.* According to Captain Jarreau (and consistent with Agent McNulty's testimony), Graham freely and voluntarily rode to Baton Rouge with Agent McNulty. *Id.*, p. 127. Captain Jarreau followed Agent McNulty and Graham into Baton Rouge in a separate vehicle. *Id.*, 115. At some point after the polygraph test had commenced, Agent McNulty came out and advised Captain Jarreau that Graham had confessed to the polygraphist that he had committed the murder and had disposed of the body in the Atchafalaya River. *Id.* Captain Jarreau then took Graham's statement. *Id.*

Captain Jarreau testified consistently with Agent McNulty concerning the fact that he read Graham a *Miranda* rights form prior to taking his statement; that, at no time during the reading of the rights form or during the giving of his statement, did Graham ask to speak with an attorney; that no threats, promises, or coercion occurred to get Graham to sign the form or to give his statement; and that Graham appeared to understand the rights read to him and acknowledged same by initialing and signing the rights form. *Id.*, p. 116.

The State also called Detective Michael Sparks ("Detective Sparks") of the Iberville

---

*Id.*, p. 119.

[5] Captain Jarreau also indicated that Graham never expressed any problem with talking to him about the case while at the Livonia substation on December 30, 1998; he only indicated that he was not sure whether he should take the polygraph test and that he wanted to talk to an attorney in that regard. *Id.*, p. 125.

15

Parish Sheriff's Office to the stand at the suppression hearing. *Id.*, at 128. Detective Sparks testified that he worked in conjunction with the Pointe Coupee Parish Sheriff's Office in connection with the disappearance of Collins. *Id.* Specifically, on December 28, 1998, he took part in some questioning of Graham. *Id.*, p. 129. He testified he was present on December 28th when Graham signed the rights form in the presence of Chief Gueho and Detective Olinde and that no promises, threats, or coercion occurred in order to get him to sign that form or to discuss his involvement in Collins' disappearance. *Id.* Detective Sparks further testified that Graham appeared to understand the rights read to him on that day and that he freely and voluntarily signed the form and gave a statement concerning his involvement in Collins' disappearance. *Id.* In explaining the statement that Graham made on December 28, 1998 concerning his last involvement with Collins, Detective Sparks' testimony was consistent with that of Chief Gueho. *Id.*, p. 130-131.

Detective Sparks also testified that he spoke with Graham again on December 30, 1998, when he was contacted by Detective Olinde at the Pointe Coupee CID in reference to the fact that Graham had confessed to killing Collins and that it was relatively certain that the crime had occurred in Iberville Parish, rather than Pointe Coupee Parish. *Id.*, p. 131. Detective Sparks met Detective Olinde at the Pointe Coupee CID, at which time another rights form was explained to Graham, and he indicated that he understood his rights. *Id.*, p. 131-132. During that time, Graham never asked for a lawyer, and Detective Sparks testified that Graham was not coerced, promised, or threatened into signing the rights form or providing information. *Id.*, p. 132. At that point, Graham explained to Detective Sparks that his story was "pretty much the same" until after he and Collins had sex. He stated that Collins had asked for some money and became angry because Graham did not have any;

16

that she got out of the truck and came around to Graham's side of the truck; that he reached into the truck and grabbed a hunting arrow; and that, when she came toward him, he held it out, and she walked into the arrow. *Id.*, p. 133. Graham stated that he pulled the arrow out of Collins' body, and when he realized Collins was dead, he put her in his truck and drove to the Melville Ferry, where he put her body in the Atchafalaya River. *Id.* Graham went with Detective Sparks to Melville Ferry and showed him where and how he disposed of Collins' body. *Id.*, p. 134. At no point during that trip did Graham ask for a lawyer, nor was he threatened, promised or coerced to provide information. *Id.*

Detective Sparks met with Graham again on December 31, 1998, at which time Graham executed another rights form. *Id.*, p. 134. That rights form was executed so that photographs of Graham's entire body could be taken, and per Detective Sparks' testimony, Graham "had no problem with that." *Id.*, p. 134-135. Detective Sparks testified that Graham's rights were read aloud and explained to him at that time; that no threats, coercion, or promises were made to him in order to obtain his signature on that rights form; and that Graham appeared to understand his rights and sign the rights form freely and voluntarily. *Id.*, p. 151-152. At no point during the explanation of the rights form did Graham ask to consult a lawyer. *Id.*, p. 152.

Later that same day, December 31, 1998, Detective Sparks met with Graham again at his office at the North Iberville substation. *Id.*, p. 153. At that point, Graham signed another *Miranda* rights form that was read aloud and explained to him by Detective Sparks. *Id.*, p. 154. Again, Graham did not ask to consult with a lawyer, and no threats, coercion, or promises occurred to get him to sign the rights form. *Id.* Detective Sparks testified that he met with Graham that second time on December 31st because Graham agreed to show

17

him the field where the crime allegedly occurred.  *Id.*, p. 155-156.  At no time during that excursion did Graham request to speak to an attorney.  *Id.*, p. 156.

Detective Sparks interviewed Graham one last time on January 2, 1999.  *Id.*, p. 157. During that interview, Graham had his rights explained to him again and executed yet another rights form.  *Id.*, p. 158.  Detective Sparks testified that Graham appeared to understand his rights and that he signed the form freely and voluntarily.  *Id.*  The purpose of that meeting was to determine exactly where Graham disposed of Collins' body because officials were having difficulty locating it at the Melville Ferry.  *Id.*, p. 159.  Graham never asked to consult with a lawyer during that meeting.  *Id.*, p. 160.

The State also called Lt. Kevin McDonald ("Lt. McDonald") of the Pointe Coupee Sheriff's Office as a witness at the suppression hearing.  Lt. McDonald testified that he was one of the officers who went to Soprano's on December 30, 1998 to talk to Graham.  *Id.*, p. 173.  He testified that he, Captain Jarreau, and Major Leonard verbally *Mirandized* Graham at Soprano's and asked if they could speak to him about the polygraph test. Graham said he would meet them at the Livonia substation, and he did so.  *Id.*  Lt. McDonald testified consistently with Captain Jarreau and other officials about the fact that Graham had not been placed under arrest at the time of that meeting and that he was contacted because he was the last person known to have been in contact with Collins.  *Id.*, p. 174.  He indicated that Graham was read his *Miranda* rights as a matter of procedure since they wanted to talk to him in reference to the case and in the event he made any statements.  *Id.*  According to Lt. McDonald, upon reaching the substation, Graham was again verbally *Mirandized* and asked about taking the polygraph test, and he indicated that he had some doubt about taking the test because some of his friends had told him not to

18

take it.  *Id.*, p. 175.  Lt. McDonald confirmed that, at that time, Graham was not in custody, had not been arrested, was not handcuffed, and was free to leave.  *Id.*  He also stated that Graham never indicated he wanted a lawyer present at any time during those discussions and simply indicated that he wanted to speak with an attorney by phone regarding the polygraph test.  *Id.*  Lt. McDonald said that he was present when Major Leonard advised that he was going to contact Mr. D'Aquila by phone.  *Id.*

Per Lt. McDonald's testimony, Graham never expressed to him or to anyone else in his presence that he refused to take the polygraph test.  *Id.*, p. 176.  He simply said that he had some doubt about taking the test due to what his friends had told him.  *Id.* Subsequently, Graham decided that he would rather "get it over with" and take the test; however, he was not placed under arrest nor was he handcuffed when he was transported to the FBI office for the polygraph test.  *Id.*  Lt. McDonald, like all of the other law enforcement officers involved, testified that Graham voluntarily traveled with the FBI agent to Baton Rouge for his polygraph test.  *Id.*

The State's last two witnesses at the suppression hearing were Major Leonard and Detective Olinde, both of whom confirmed the testimony previously elicited from other law enforcement officials.  Major Leonard testified that he accompanied Captain Jarreau and Lt. McDonald to meet with Graham at Soprano's on December 30, 1998. *Id.*, p. 184.  He testified consistently with those officers about the fact that, after Graham arrived at the substation, he was informed of his *Miranda* rights and voluntarily signed a rights form.  *Id.*, p. 186.  He testified that Graham was "quite cooperative" and could have left at any time had he wished to do so.  *Id.*  Major Leonard also indicated that Graham had concerns about taking the polygraph test based upon what his friends had told him and that he

19

wished to talk to an attorney about those concerns.  *Id.*  Major Leonard confirmed that he contacted Mr. D'Aquila's office for Graham, and when it became apparent that Mr. D'Aquila could not be reached, Graham was asked whether there was another attorney that he would like to contact.  *Id.*, p. 187.  However, at that point, Graham decided not to have another attorney contacted and indicated he would "just go ahead and take the test.  It's not a problem."  *Id.*  Major Leonard testified that Graham never refused to take the polygraph test but just had some concerns about it. *Id.*, p. 187.  He also indicated that Graham never informed him that he had advised Chief Gueho earlier in the day that he did not want to take the polygraph test on advice of counsel.  *Id.*, p. 189.

Detective Olinde testified that, during the course of the investigation relating to the disappearance of Collins, he arranged for polygraph examinations of Graham and Collins' husband on December 30, 1998.  *Id.*, p. 196.  Detective Olinde testified that he (and Chief Gueho and Detective Sparks) had been involved in an interview of Graham prior to that, on December 28, 1998, at the Livonia substation, and the purpose of the polygraph was to verify portions of that December 28th interview since the missing persons case was still under investigation.  *Id.*, p. 198.  Detective Olinde was in contact with Chief Gueho, who advised that he had spoken with Graham at Soprano's and that Graham agreed to take the polygraph test.  *Id.*, p. 200.  Subsequently, Detective Olinde received word that Graham was not going to be available for the polygraph, and in his report, Detective Olinde noted that Chief Gueho told him such decision by Graham was based upon the advice of counsel. However, Detective Olinde testified that he did not tell Captain Jarreau, Major Leonard, Detective Sparks, Agent McNulty, or Agent Edwards (the polygraphist) that Graham's decision not to take the test was based upon the advice of counsel.  *Id.*, 200-201; 205-207-

20

208.  Detective Olinde confirmed that, when Graham left the Livonia substation with Agent McNulty to proceed to Baton Rouge for his polygraph test, he was not under arrest and was not handcuffed.  *Id.*, p. 204.  He testified that Graham never, in his presence, asked personally for an attorney throughout his involvement in the investigative process and that he made statements to him and other police officers freely and voluntarily.  *Id.*, p. 204, 210-211.  Following testimony by one other witness concerning a matter unrelated to the admissibility of Graham's statements to police, the State rested its case relative to Graham's motion to suppress.

The defense then presented the testimony of Graham himself.  Graham testified that he first found out he would be questioned regarding the disappearance of Collins on December 27, 1998.  *Id.*, p. 217.  He spoke with Chief Gueho and Detective Olinde on December 28th, and on December 30th, Chief Gueho came by Soprano's while he was working.  *Id.*  According to Graham, Chief Gueho asked him if he would be willing to take a polygraph test.  Graham told him that he was not refusing to take such a test but that he would like to speak with an attorney first.  Graham testified that he tried to reach the office of Mr. D'Aquila that day around 10:30 a.m. but was unable to reach him.  Later that day, Graham had contact with three other police officers, Major Leonard, Lt. McDonald, and Captain Jarreau, while at Soprano's. *Id.*, p. 218.  He testified that he told those officers he was not going to "answer any questions or anything without speaking with [his] attorney first."  *Id.*  However, he voluntarily drove himself to the Livonia substation to talk to them.

Graham testified that, once he arrived at the substation, the police officers asked him if he had a lawyer, and from what he could see, it appeared that Major Leonard tried to contact Mr. D'Aquila after Graham identified him as an attorney he would like to consult.

21

*Id.* Graham indicated that, after he told the officers he did not want to make a statement until he had spoken with a lawyer, they proceeded to question him. *Id.*, p. 218-219. He also testified that, when he signed the various rights forms, he never told them that he did not want to talk to a lawyer. *Id.*, p. 219. According to Graham, he thought that saying he wanted to consult with a lawyer "that one time" was sufficient and that he did not need to say it again. *Id.*, 219, 221. He believes he also told Agent McNulty that he wanted to speak with a lawyer, but Agent McNulty nevertheless proceeded to question him. *Id.* He also indicated he was never told by any of the officers that he could leave. *Id.*, p. 220.

Graham testified that, when he was traveling to Baton Rouge for his polygraph test with Agent McNulty, he did not know where they were going until they were "about halfway there." *Id.* He indicated that, after he took the polygraph test and failed it, he was told by the polygraphist that it was "best that [he] come out now and [tell] everything [he] know[s] or [he]'d be going to prison for the rest of [his] life." *Id.* Graham testified that the polygraphist did not advise him of his rights. *Id.*, p. 221. He went on to tell the polygraphist the following, "[I]f you all want to hear me say I killed her, I done it." *Id.*, p. 222. According to Graham, the polygraphist then left the room and got the other detectives. *Id.* Graham admitted that Captain Jarreau and Agent McNulty advised him of his rights after the polygraph but before he gave his taped statement. *Id.* He said that he did not tell them that he wanted a lawyer at that point because he did not think that he needed to do so since he had told them already. He believed they were not paying attention to him. *Id.*

Later that night, on December 30, 1998, Graham was questioned again at the Pointe Coupee Parish CID by Detective Sparks and Captain Jarreau. *Id.* Graham testified that, at that time, he told them again that he did not want to answer any questions before

22

speaking with his attorney, but the officers "didn't really say anything." *Id.*, p. 223. He said both officers left the room for five to ten minutes and then came back in and proceeded to question him again. *Id.* Graham testified that he continued to answer questions, even though the officers had not heeded his requests for an attorney, because he figured "it wasn't doing me no good saying I wanted an attorney. They were just going to keep badgering and badgering until I tell them what they wanted to hear." *Id.*

Graham also testified that, at the time he signed the rights forms on December 31st, when Detective Sparks and Detective Olinde took photographs of him, and at the Iberville Parish jail when he was interviewed by Detective Sparks and Blair Favron, he again asked for a lawyer. *Id.*, p. 223-224. He also contended he asked for a lawyer when he went with officers to the field where the crime occurred and to the Melville Ferry. *Id.*, p. 224. Graham testified that he was never offered a phone to contact an attorney nor was he ever told he could leave; however, he admitted he never asked if he could leave. *Id.*, p. 224-225.

On cross-examination, Graham conceded that he did not tell the three officers that came to Soprano's on December 30, 1998 that he would not talk to them until he talked to a lawyer, and he admitted that he went to the Livonia substation that day of his own free will – that they did not handcuff him or arrest him and that he drove his own car to the substation. *Id.*, p. 230, 235. He also admitted he was advised of his *Miranda* rights when he arrived at the substation, but he claimed that he told the police at that point that he would not talk to them until he could speak with an attorney. *Id.*, p. 230-231. He acknowledged that, while at the substation, he was not under arrest, was not handcuffed, and never asked to leave. *Id.*, p. 231, 233, 235.

Graham also admitted that he signed a rights form pertaining to the polygraph test

on December 30th and that he never refused to take the test and never stopped the test at any time.  *Id.*, p. 236.  When asked why he signed the various rights forms, Graham indicated that he was "under the impression that [he] was going to have a lawyer."  *Id.*, p. 241.  He further indicated that he signed the rights forms and talked to the officials, even though he wanted a lawyer and asked for a lawyer, because he figured the officials "was going to question [him] regardless" and that it was a "no-win situation."  *Id.*, p. 243-245.  He admitted that all the rights on the forms were read aloud to him and that he initialed the forms indicating he understood such rights.  *Id.*  He could not explain why he did not have the officials check the "no" box indicating that he did not want to talk to them and why he did not simply refuse to answer the officials' questions.  *Id.*, p. 245.  He admitted that it was his fault he did not just leave and not answer their questions; he said he "didn't know what [he] was doing."  *Id.*

    **(B)**    **Analysis of Claim No. 1:**

    Considering the above testimony, the Court finds that the trial court's decision denying Graham's motion to suppress his inculpatory statements to police was not contrary to, or an unreasonable application of, federal and constitutional law regarding Graham's rights to counsel and against self-incrimination.  First, the Court finds that the issuance of *Miranda* warnings (and the associated rights to remain silent and to retain counsel) does not appear to have even been required during the time period when Graham provided statements to police and subjected himself to the polygraph test.  As discussed in the above testimony of various law enforcement officers, the Collins' case was still in its investigative stage as a missing persons case on December 28-30, 1998.  It had not yet been determined, until after Graham submitted to the polygraph test, that Collins had been

24

killed.  Graham was contacted by law enforcement officials because they had received word that he was the last person seen with Collins on the night in question.  Graham was informed that, as a matter of investigation in a missing persons case, the police wanted to talk to him about his knowledge of her whereabouts; he was further advised that the FBI wanted to take a polygraph test as a matter of procedure to possibly eliminate him as a suspect in Collins' disappearance.

It is undisputed that, when Major Leonard, Lt. McDonald, and Captain Jarreau went to Soprano's on December 30th and asked if Graham would come to the substation to discuss taking the polygraph test, Graham had not been placed under arrest, was not handcuffed, and was not forced in any way to go to the police substation.  Graham voluntarily agreed to go and, in fact, drove himself to the substation to discuss the matter. Furthermore, it is undisputed that he was not arrested, handcuffed, or forced to ride with Agent McNulty to the FBI office in Baton Rouge to take the polygraph test.  Although Graham was advised on multiple occasions throughout the investigation that he had the right to remain silent and not answer questions, he continued to answer the officials' questions, and at the suppression hearing, he provided no credible explanation as to why he continued to do so.  Finally, although Graham testified that he did not know he was free to leave, he also indicated that he never asked if he could leave, and on several occasions, he voluntarily appeared for interviews and excursions with law enforcement officials and never attempted to leave during such meetings.

The United States Supreme Court has held that *Miranda* warnings (and, thus, the associated rights to remain silent and to counsel) are not even required where a defendant, although a suspect, is not placed under arrest and voluntarily comes to the police station

25

and is allowed to leave unhindered after a brief interview.  *California v. Geheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983).  Although the circumstances of each case certainly influence the determination of whether a suspect is "in custody" for purposes of receiving *Miranda* protection, the "ultimate inquiry" is simply whether there was a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest. *Id.*, 1125.  The totality of the evidence at the suppression hearing indicates that, at the time Graham provided his incriminating statements to police, he had not yet been arrested nor was there any formal restraint on his freedom of movement.  All of the law enforcement officials involved in the Collins' investigation testified that Graham fully cooperated with police and freely and voluntarily met with them and gave statements to them concerning his involvement in Collins' disappearance/death.  The record also reflects that Graham had been previously arrested and was therefore aware of the restraints upon one's liberty brought about by an arrest, which did not occur in this case.  Under the circumstances, it does not appear that Graham's *Miranda* rights to remain silent and to counsel had even been triggered at the time he provided his incriminating statements; accordingly, the trial court acted appropriately in finding that those statements were admissible against him.

Moreover, even assuming Graham's *Miranda* rights were triggered by the actions of law enforcement in asking him to come to the substation to talk to them about his involvement in the Collins' case and to discuss taking a polygraph test, the Court nevertheless finds that law enforcement properly advised him of his *Miranda* rights and that Graham did not "clearly and unequivocally" request the assistance of counsel prior to providing his incriminating statements.  In order to invoke the *Miranda* right to counsel, a suspect must, at a minimum, make "some statement that can reasonably be construed to

26

be an expression of a desire for the assistance of an attorney." *Davis v. U.S.*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). "If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," the cessation of questioning is not required. *Id.* In sum, the suspect must *unambiguously* and *unequivocally* request counsel. *Id.* [Emphasis added]*; See also, Moan v. Burbine*, 475 U.S. 412, 433, n. 4, 106 S.Ct. 1135, 1147, n. 4, 89 L.Ed.2d 410 (1986).

When Graham indicated that he was not sure whether he wanted to take the polygraph test and that he wished to talk to an attorney about it, the officials did not proceed to question him, and Major Leonard attempted to contact the attorney identified by Graham. When that attorney could not be reached, officials asked Graham if there was another attorney he would like for them to contact. Graham identified another attorney but then indicated that he no longer wanted to consult with an attorney regarding the polygraph test and that he would take the test. Such a retracted request to consult with counsel is indecisive and equivocal, and it was reasonable for law enforcement to proceed with the polygraph test and with questioning after Graham withdrew that request. *See, Davis*, at 461-62 (The U.S. Supreme Court has held that law enforcement officers are not required to stop questioning a suspect when he makes an equivocal or ambiguous request for counsel, nor are they required to ask clarifying questions to help protect the rights of a suspect by ensuring that he gets an attorney if he wants one).

Additionally, even assuming Graham initially made a "clear and unequivocal" request to consult with a lawyer regarding the polygraph test, he subsequently waived his right to counsel by retracting his request and by voluntarily reinitiating conversation with law

27

enforcement and subjecting himself to the polygraph test.  The overwhelming majority of the testimony at the suppression hearing indicated that Graham voluntarily rode with Agent McNulty to Baton Rouge to take the polygraph test.  Upon arriving at the FBI office in Baton Rouge, he was again advised of his right to an attorney, as he was on multiple occasions subsequent to that, and he signed a waiver of rights form expressly indicating that he did not wish to have counsel present for the polygraph test.  Moreover, he again waived his right to an attorney orally on tape when he provided his statement to Captain Jarreau following the polygraph test.  While Graham testified at the suppression hearing that he told law enforcement on several occasions that he wanted to consult with a lawyer, it is clear that, in evaluating the credibility of witnesses at that hearing, the trial judge chose to believe the consistent testimony of the various law enforcement officials over that of Graham relative to whether he ever requested an attorney after his initial request, and this Court must defer to the trial judge's assessment in that regard.  It is highly unlikely that each of those law enforcement officers, who testified Graham never asked for an attorney, was lying or that they all simply ignored Graham's requests, as he asserted at the hearing.

Although Graham relies upon the case of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), in support of his contention that his motion to suppress was improperly denied, that case is distinguishable.  In *Edwards*, the petitioner was arrested on a state criminal charge, and after being informed of his *Miranda* rights, he was questioned by the police until he said he wanted an attorney.  Questioning then ceased, but the next day, police officers returned to the jail and stated that they wanted to talk to the petitioner again.  The petitioner initially indicated that he did not want to speak to them. The officers informed the petitioner of his *Miranda* rights, and the petitioner then stated that

28

he would talk, although nothing appeared in the record as to what prompted his change of heart. The petitioner then listened to part of a taped statement made by one of his alleged accomplices and made his own incriminating statement, which was allowed to be used against him at trial. The U.S. Supreme Court held that use of the petitioner's confession against him at his trial violated his Fifth and Fourteenth Amendment rights to have counsel present during custodial interrogation as required by *Miranda*. Having initially exercised his right to have counsel present during interrogation, the petitioner did not validly waive that right on the following day because the additional questioning by police was initiated at the instance of the police rather than by the petitioner. *Id.*, at 484-485.

In the present case, unlike in *Edwards*, Graham had not been arrested at the time he made his statements to police. In fact, he voluntarily drove himself to the substation for discussions with the police on multiple occasions (and had his car present so that he could leave if he wished to do so, in contrast to Edwards, who was under arrest and confined in jail at the time of his incriminating statements) and voluntarily rode with Agent McNulty to Baton Rouge and submitted to the polygraph test. Thus, at the time Graham made his incriminating statements, he was not "in custody," and his *Miranda* rights had not been triggered, as they had been in the *Edwards* case. Additionally, even if Graham's *Miranda* rights had been triggered and he invoked his right to counsel when he asked to talk to an attorney about whether to take the polygraph test, his change of heart concerning whether to consult an attorney and his continued discussions with police and decision to proceed with the polygraph test reflect a knowing and voluntary waiver of his right to counsel. Accordingly, the incriminating statements that he made without the presence and/or assistance of counsel were properly admissible against him, and his first habeas claim

29

should therefore also be dismissed.

## **RECOMMENDATION**

For the above reasons, it is recommended that the Petition for Writ of Habeas Corpus (R. Doc. 1) filed by Randall Graham be **DISMISSED WITH PREJUDICE**.

Signed in chambers in Baton Rouge, Louisiana, October 16, 2008.

**MAGISTRATE JUDGE CHRISTINE NOLAND**